UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

BRIAN M. RICHARDS,

                    Plaintiff,

        v.                                          **DECISION AND ORDER**
                                                    **05-CV-0528**
JOANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

## Introduction

1.      Plaintiff Brian M. Richards challenges an Administrative Law

Judge's ("ALJ") determination that he is not entitled to disability insurance

benefits ("DIB") under Title II of the Social Security Act ("the Act") or to

supplemental security income ("SSI") under Title XVI of the Act.  Plaintiff

alleges he has been disabled since April 15, 2000, because of pain and

limitations that resulted from a traumatic brain injury sustained when Plaintiff

fell approximately 20 to 30 feet in an outdoor rock climbing accident.  Plaintiff

met the disability insured status requirements of the Act at all times pertinent

to this claim.

## Procedural History

2.      Plaintiff filed concurrent applications for DIB and SSI on May 18,

2000.  His applications were denied initially and upon reconsideration, and

Plaintiff took no further action until he applied protectively for SSI on May 28,

2002.  This application was denied initially and, under the prototype model of

handling claims without requiring a reconsideration step, Plaintiff was

permitted to appeal directly to the ALJ.  See 65 Fed. Reg. 81553 (Dec. 26, 2000).   Pursuant to Plaintiff's request, an administrative hearing was held on June 12, 2003, before ALJ Laura S. Havens, at which time Plaintiff and his attorney appeared.  A vocational expert also appeared and testified at the hearing.[1]  The ALJ considered the case *de novo*, and on August 5, 2003, issued a decision finding that Plaintiff was not disabled.  On March 7, 2005, the Appeals Council denied Plaintiff's request for review.

3.      On April 29, 2005, Plaintiff filed a Civil Complaint challenging Defendant's final decision and requesting the Court review the decision of the ALJ pursuant to Section 205(g) and 1631(c) (3) of the Act, modify the decision of Defendant, and grant DIB and/or SSI benefits to Plaintiff.[2]  The Defendant filed an answer to Plaintiff's complaint on August 10, 2005, requesting the Court to dismiss Plaintiff's complaint.  Plaintiff submitted a *Memorandum of Law* (hereinafter called "Plaintiff's Brief") on October 31, 2005.  On December 13, 2005, Defendant filed a *Memorandum of Law In Support of the Commissioner's Motion for Judgment on the Pleadings*[3] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  After full briefing, the Court deemed oral argument unnecessary and took the motions under advisement.

## Discussion

---

[1] Plaintiff's mother attended the hearing as an observer but did not testify.
[2] The ALJ's August 5, 2003, decision became the Commissioner's final decision in this case when the Appeals Council denied Plaintiff's request for review.
[3] Although no motion for judgment on the pleadings was filed, the moving party was excused from such filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceeding as if both parties had accompanied their briefs with a motion for judgment on the pleadings…"

**Legal Standard and Scope of Review:**

4.      A court reviewing a denial of disability benefits may not determine

*de novo* whether an individual is disabled.  See 42 U.S.C. § 405(g), 1383

(c)(3); Wagner v. Sec'y of Health and Human Servs., 906 F.2d 856, 860 (2d

Cir. 1990).  Rather, the Commissioner's determination will only be reversed if

it is not supported by substantial evidence or there has been a legal error.

See  Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615

F.2d 23, 27 (2d Cir. 1979).  "Substantial evidence" is evidence that amounts

to "more than a mere scintilla," and it has been defined as "such relevant

evidence as a reasonable mind might accept as adequate to support a

conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427,

28 L. Ed. 2d 842 (1971).  Where evidence is deemed susceptible to more

than one rational interpretation, the Commissioner's conclusion must be

upheld.  See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

5.      "To determine on appeal whether the ALJ's findings are supported

by substantial evidence, a reviewing court considers the whole record,

examining evidence from both sides, because an analysis of the substantiality

of the evidence must also include that which detracts from its weight."

Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).  If

supported by substantial evidence, the Commissioner's finding must be

sustained "even where substantial evidence may support the plaintiff's and

despite that the court's independent analysis of the evidence may differ from

the [Commissioner's]."  Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y.

1992).  In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review."  Valente v. Sec'y of Health and Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

6.     The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled as defined under the Social Security Act.  See 20 C.F.R. § 404.1520, 416.920.  The United States Supreme Court recognized the validity of this analysis in Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987), and it remains the proper approach for analyzing whether a claimant is disabled.

7.     This five-step process is detailed below:

First, the [Commissioner] considers whether the claimant is currently engaged substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work active-ties.  If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled with-out considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gain-ful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also Rosa v. Callahan, 168 F.3d 72,77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

8.      While the claimant has the burden of proof as to the first four steps, the Commissioner has the burden of proof on the fifth and final step.  See Bowen, 482 U.S. at 146 n.5; Ferraris v. Heckler, 728 F.2d 582 (2d Cir. 1984). The final step of this inquiry is, in turn, divided into two parts.  First, the Commissioner must assess the claimant's job qualifications by considering his physical ability, age, education, and work experience.  Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform.  See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); Heckler v. Campbell, 461 U.S. 458, 460, 103 S. Ct. 1952, 1954, 76 L. Ed. 2d 66 (1983).

9.      In this case, the ALJ made the following findings with regard to factual information as well as the five-step process set forth above: (1) Plaintiff met the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision (R. at 22);[4] (2) Plaintiff has engaged in substantial gainful activity since the alleged onset of disability.  Plaintiff's work from February 2001 through November 2001 must be considered as substantial gainful activity (20 C.F.R. §§ 404.1572 and 416.972).  Accordingly, the first date Plaintiff could be considered to be disabled would be November 20, 2001, the date after the last day Plaintiff performed substantial gainful activity (20 C.F.R. §§ 404.1520(b) and

---

[4] Citations to the underlying administrative are designated as "R."

416.920(b)) (R. at 22); (3) Plaintiff's residual effects of an organic brain injury is a severe impairment, based on the requirements in the Regulations 20 C.F.R. §§ 404.1521 and 416.921 (R. at 22); (4) This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4 (R. at 22); (5) The ALJ found Plaintiff's allegations regarding his limitations to be generally credible, but not necessarily to the degree of limitation claimed, in light of the injury he suffered (R. at 22); (6) The ALJ carefully considered all of the medical opinions in the record regarding the severity of Plaintiff's impairment (20 C.F.R. §§ 404.1527 and 416.927) (R. at 22);  (7) Plaintiff has the following residual functional capacity: a wide range of unskilled work not requiring more than light exertion (R. at 23);  (8) Plaintiff is unable to perform any of his past relevant work (20 C.F.R. §§ 404.1565 and 416.965) (R. at 23); (9) Plaintiff is a "younger individual between the ages of 18 and 44" (20 C.F.R. §§ 404.1563 and 416.963) (R. at 23); (10) Plaintiff has a "high school (or high school equivalent) education" (20 C.F.R. §§ 404.1564 and 416.964); (11) Plaintiff has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 C.F.R. §§ 404.1568 and 416.968) (R. at 23); (12) Plaintiff has the residual functional capacity to perform a significant range of light work (20 C.F.R. § 416.967) (R. at 23); (13) Although Plaintiff's exertional limitations do not allow him to perform the full range of light work, using the Medical-Vocational Rule 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that he

could perform.  Examples of such jobs include work as a mail clerk, as a hand

packer, or as an order clerk (R. at 23); and  (14) Plaintiff was not under a

"disability," as defined in the Social Security Act, at any time through the date

of the ALJ's decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)) (R. at 23).

Ultimately, the ALJ determined Plaintiff was not entitled to a period of

disability and disability insurance benefits as set forth in sections 216(i) and

223(d) of the Social Security Act, and was not eligible for supplemental

security income payments as set forth in sections 1602 and 1614(a)(3)(A) of

the Act (R. at 23).

## Plaintiff's Challenges

10.    Plaintiff challenges the decision of the ALJ on the basis that it is not

supported by the substantial evidence of record.  Specifically, Plaintiff alleges

(1) the ALJ erroneously concluded Plaintiff engaged in substantial gainful

activity ("SGA") from May 1, 2001, through November 19, 2001, thus limiting

the first date Plaintiff could be considered disabled to November 20, 2001, (2)

the ALJ ignored the medical findings and opinions of Plaintiff's treating

physicians, as well the opinions of State agency examining physicians, and

substituted her lay opinion for these medical source opinions, (3) the ALJ

rejected Plaintiff's testimony regarding his pain and limitations, and failed to

provide sufficient specific rationale in her credibility analysis as required by

SSR 96-7p, and (4) the ALJ improperly concluded Plaintiff retained the

residual functional capacity to work on a regular and continuous basis, in

spite of Plaintiff's pain, limitations, and side effects from his medications.

Each of Plaintiff's challenges is discussed below.  With respect to Plaintiff's challenges one and two, the Court affirms the findings of the ALJ.  With respect to Plaintiff's challenges three and four, the Court remands this matter to the Commissioner for further administrative proceedings.

### Challenge 1: The ALJ Erroneously Concluded Plaintiff Engaged in SGA from May 1, 2001, Through November 19, 2001

11.     Plaintiff's first challenge to the ALJ's decision is that she erroneously concluded that Plaintiff engaged in substantial gainful activity during the time frame from May 7, 2001 through November 19, 2001.  See Plaintiff's Brief, pp. 2-3.  Plaintiff claims his work during this period of time as a janitor was an unsuccessful work attempt.  Id. at 3.  The Court disagrees with Plaintiff's challenge for the reasons set forth below.

The Commissioner's regulations provide that work performed for six months or less will not be considered substantial gainful activity if a claimant's impairment(s) forced the claimant to stop working, or caused a claimant to reduce his or her hours to a level that caused earnings to fall below the substantial gainful activity level as calculated by the formula set forth in 20 C.F.R.  § 404.1574(b)(2)(ii).  During the calendar year 2001, if a claimant's monthly earnings averaged over the time period during which a claimant worked exceeded $739.01, the claimant would be presumed to have engaged in substantial gainful activity.  See 20 C.F.R. § 404.1574(b)(2)(ii); SSR 83-35; see also http://www.ssa.gov/OACT/COLA/awiseries.html.  In this matter, Plaintiff worked continuously from May 7, 2001, until November 19, 2001, and

earned $19,866.33 (R. at 58, 59).  His average monthly earnings during this time frame were well in excess of $3000 per month, and far above the monthly amount of $739.01 determined to represent substantial gainful activity during 2001.

Further, the Commissioner's regulations provide that if a claimant worked more than six months at the substantial gainful activity level, the claimant's work cannot be considered an unsuccessful work attempt regardless of why the work ended, or why earnings were subsequently reduced below the substantial gainful activity level.  See 20 C.F.R. § 404.1574(c)(5).

Based on the foregoing, the Court finds that contrary to Plaintiff's assertion that his work as a janitor performed between May 7, 2001, and November 19, 2001, was an unsuccessful work attempt, he did indeed engage in substantial gainful activity during this time frame.  Thus, the ALJ was correct when she determined that the first date Plaintiff could be found to be disabled was November 20, 2001 (R. at 22).

### Challenge 2: The ALJ Failed to Follow the Treating Physician Rule and Substituted Her Lay Opinion for Medical Evidence

12.    Plaintiff's second challenge to the ALJ's decision is that she failed to follow the treating physician rule when she ignored the medical findings and opinions of Plaintiff's treating psychiatrist and treating physicians, as well as the opinions of State agency examining physicians, and substituted her lay opinion for valid medical source evidence.  See Plaintiff's Brief, pp. 9-15.

Thus, Plaintiff asserts the ALJ's determination that he retained the residual functional capacity to perform a significant range of light work is not based on the substantial evidence of record.  See Plaintiff's Brief, pp. 15-17.

According to the "treating physician's rule,"[5] the ALJ must give controlling weight to the treating physician's opinion when the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  20 C.F.R. § 404.1527(d)(2); see also Green-Younger v. Barnhart, No. 02-6133, 2003 WL 21545097, at *6 (2d Cir. July 10, 2003); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000).

Even if a treating physician's opinion is deemed not to be deserving of controlling weight, an ALJ may nonetheless give it "extra weight" under certain circumstances.  Under  C.F.R. § 404.1527(d)(1)-(6), the ALJ should consider the following factors when determining the proper weight to afford the treating physician's opinion if it is not entitled to controlling weight: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of opinion, (4) consistency, (5) specialization of the treating physician, and (6) other factors that are brought to the attention of the court.  See de Roman, 2003 WL 21511160, at *9 (citing C.F.R. § 404.1527(d)(2); see also Shaw, 221 F.3d at 134; Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

---

[5] "The 'treating physician's rule' is a series of regulations set forth by the Commissioner in 20 C.F.R. SS 404.1527 detailing the weight to be accorded a treating physician's opinion." de Roman v. Barnhart, No.03-Civ.0075(RCC)(AJP), 2003 WL 21511160, at *9 (S.D.N.Y. July 2, 2003).

Having reviewed the evidence at issue, this Court detects no reversible error in the ALJ's treatment of the opinions of Plaintiff's treating psychiatrist, Dr. Vilas Patil, and his treating physicians, Doctors Karl Klamar, Karl Hafner and Robert Todd, nor with the ALJ's consideration of the opinions of State agency examiners, Dr. Berton Shayevitz and Kristen Barry, Ph.D. Rather, the ALJ's decision reflects her extensive evaluation of all the medical evidence in the record developed from the date of Plaintiff's alleged disability on April 15, 2000, through the date of the ALJ's decision on August 5, 2003 (R. at 17-23). The medical evidence includes treatment notes, evaluations of Plaintiff's progress, and test results (R. at 138-319). The opinion of Dr. Patil, was inconsistent and unsupported by the record as a whole, while the opinions of Doctors Klamar, Hafner, Todd, Shayevitz, and Barry were considered by the ALJ and whose opinions supported her determination that Plaintiff was not under a disability during the time frame relevant to his claim.

Plaintiff's medical record documents that he suffers from limitations resulting from a traumatic brain injury suffered on April 15, 2000, when he fell approximately 20 to 30 feet and struck his head in an outdoor rock climbing accident (R. at 171-173). Plaintiff was hospitalized at University Hospital and Health Care Center SUNY New York from April 15, 2000 until June 7, 2000, where he underwent surgeries for a decompression craniectomy and removal of a subdural hematoma, and partial left frontal and left temporal lobectomy. Id. Plaintiff remained in the hospital's neurosurgical intensive care unit for 13 days, and when his condition stabilized, he was transferred to the

11

neurological unit to await placement in a rehabilitation program (R. at 173).

On May 1, 2000, Plaintiff was transferred to the Physical Medicine and

Rehabilitation Unit at University Hospital and Health Care Center (R. at 169-

170).  Upon admission to the Rehabilitation Unit, Plaintiff's attending

physician, Dr. Margaret Turk, observed that he was awake and alert, followed

one-step commands inconsistently, and was non-verbal (R. at 169).  During

intensive treatment with occupational and speech therapy, Plaintiff became

independent in his basic activities of daily living, and made progress with

speaking and word finding (R. at 169-170).  On June 6, 2000, Plaintiff was

discharged from the Rehabilitation Unit at University Hospital and Health Care

Center, and entered St. Camillus Health and Rehabilitation Center for further

comprehensive rehabilitation.  Id.

Plaintiff was examined by Dr. Karl Klamar upon admission to the

program at St. Camillus (R. at 207-208).  The doctor noted Plaintiff had made

steady progress while at University Hospital, and was walking independently

for unlimited distances (R. at 207).  While Plaintiff's cognition had improved

significantly, he still had cognitive and language deficits.  Id.  Dr. Klamar

opined Plaintiff was an excellent candidate for physical, speech, occupational

and recreational therapies (R. at 208).

Upon discharge from the intensive rehabilitation program at St.

Camillus on July 11, 2000, Plaintiff had mild cognitive language deficits and

mixed aphasia[6].  His therapist noted Plaintiff could "verbalize basic wants and needs, but he "continues to experience decreased word retrieval, particularly for complex information" (R. at 213).  Plaintiff was able to follow simple commands, but demonstrated "decreased auditory comprehension for complex commands and complex information."  Id.  The therapist opined Plaintiff's verbal reasoning was moderately impaired by his word finding limitations.  Id.  Dr. Klamar ordered Plaintiff to wear a helmet at all times when he was out of bed, refrain from activities that challenged his balance or safety, and to avoid alcohol or driving a motor vehicle (R. at 204-206).

On July 12, 2000, the day after he was released from inpatient treatment at St. Camillus, Plaintiff was evaluated by a speech and language pathologist to continue with outpatient speech and language therapy (R. at 196-198).  The therapist's impression was that Plaintiff had moderate cognitive-linguistic impairments and mild borderline fluent aphasia with good repetition and poor comprehension (R. at 197).  Plaintiff's cognitive-linguistic impairment was characterized by defects in perception/discrimination, orientation, organization, recall and reasoning.  Id.  Plaintiff had difficulty comprehending information complex information.  Id.  Plaintiff was also assessed by an occupational therapist on the same day (R. at 199-203).  Goals were set to re-train Plaintiff in all aspects of independent living (R. at 203).

---

[6] Mixed aphasia: This term is applied to patients who have sparse and effortful speech, are limited in their comprehension of speech, and do not read or write beyond an elementary level. See http://www.aphasia.org/Aphasia%20Facts/aphasia_facts.html.

On August 3, 2000, Plaintiff underwent a psychiatric evaluation with State agency psychologist Jeanne Shapiro (R. at 138-141).  Dr. Shapiro noted Plaintiff was independent in most of his activities of daily living, but needed help with meal preparation (R. at 140).  He could not drive at the time of the examination, but could use public transportation.  Id.  The doctor observed Plaintiff's attention and concentration skills were within normal limits, but his reading, writing, and mathematical skills were significantly impaired.  Id.  Dr. Shapiro opined Plaintiff was functioning in the mild range of mental retardation, but "should be able to work in an appropriate setting if he is appropriately trained" (R. at 140-141).  She noted Plaintiff was a good candidate for vocational assessment and training (R. at 141).

Dr. Shapiro also completed an organicity evaluation of Plaintiff on the same day (R. at 142-146).  Intelligence tests revealed Plaintiff was functioning in the mild range of mental retardation (R. at 144).  The doctor opined Plaintiff had no significant psychological symptomatology that would interfere with his ability to work, but given his deficits in cognitive functioning, he could have difficulty following complex instructions or completing complex tasks (R. at 145).  She thought Plaintiff should be able to understand and follow simple directions and perform rote tasks.  Id.  Dr. Shapiro noted that even though Plaintiff's intelligence tests revealed he was functioning at the mildly retarded level, with appropriate training, he should be able to work.  Id.

Plaintiff underwent a neurology examination with State agency physician, Dr. Berton Shayevitz on August 3, 2000 (R. at 256-259).  While

Plaintiff's physical examination was unremarkable, Dr. Shayevitz observed Plaintiff had limitations in cognition, memory and judgment (R. at 259).  The doctor also accepted the physical limitations placed on Plaintiff by his treating physicians, which included avoiding alcohol and non-prescription drugs, and avoiding any activities that would be strenuous, dangerous, require balance, or overhead lifting.  Id.

Plaintiff followed up with his treating physician, Dr. Karl Klamar, on August 31, 2000 (R. at 192-193).  Plaintiff's physical examination was unremarkable (R. at 192).  He denied vision problems, headaches, or seizures (R. at 192).  Dr. Klamar observed Plaintiff's language skills remained somewhat disorganized, although his word finding had improved.  Id.  The doctor recommended Plaintiff continue with occupational therapy, speech and language therapy, and rehabilitation counseling (R. at 193).

On September 15, 2000, a social security consultant, Thomas Harding, Ph.D, completed a Mental Residual Functional Capacity Assessment of Plaintiff (R. at 147-148).  Based on Plaintiff's medical records and the results of the examinations by Doctors Shapiro and Shayevitz, Dr. Harding assessed Plaintiff as "not significantly limited" in understanding and memory, sustained concentration and persistence, social interaction, and adaptation.  Id.  While Dr. Harding noted Plaintiff "currently has a moderate cognitive-linguistic impairment and borderline aphasia," he opined Plaintiff had made good progress with recuperation after his accident, and should be able to return to his past relevant work within one year from the date of his

injury (R. at 148).  Dr. Harding also completed a Psychiatric Review

Technique form on September 15, 2000 (R. at 149-157).  He assessed

Plaintiff as having dementia from head trauma that produced slight functional

limitations in Plaintiff's activities of daily living and social functioning, and

minor deficiencies in concentration, persistence or pace (R. at 158).  Because

continued progress was expected in Plaintiff's cognitive functioning in the

months leading up to the first-year anniversary of his injury, Dr. Harding

recommended a durational denial of Plaintiff's claim for DIB (R. at 150).

A Physical Residual Functional Capacity Assessment of Plaintiff

was completed by a State agency consultant on September 18, 2000 (R. at

158-163).  No physical limitations were established for Plaintiff.  Id.  It was

noted by the consultant that Plaintiff's only physical restriction was the need

to wear a helmet and to avoid situations where he might hit his head (R. at

163).

Plaintiff was admitted to St. Joseph's Hospital Health Center on

November 3, 2000, where he underwent a left cranial implant and

cranioplasty to repair the cranial defect created by the surgeries performed

shortly after his rock climbing accident (R. at 165).  His neurosurgeon, Dr.

Craig Montgomery, reported that Plaintiff tolerated the procedure well, with no

neurological trauma.  Id.  Plaintiff was discharged from the hospital in good

condition on November 6, 2000.  Id.

On November 25, 2000, Plaintiff was admitted to University

Hospital after he reported having seizures for approximately one and one-half

weeks (R. at 168-169).  He told his neurosurgeon, Dr. Gerard Rodziewicz, that he had "simply stopped taking his medications," although Plaintiff denied having any significant side effects with the anti-seizure medication, Tegretol[7] (R. at 167).  Plaintiff's physical examination was unremarkable, as were the x-rays of his skull.  Id.  He was restarted on Tegretol and released from the hospital the following day (R. at 167-168).

Plaintiff followed up with his rehabilitation physician, Dr. Klamar, on January 11, 2001 (R. at 190-191).  Plaintiff reported having a seizure on January 9, 2001, and being treated at A. Lee Memorial Hospital Emergency Room, although documentation from this episode is not contained in Plaintiff's record (R. at 190).  Plaintiff's physical examination by Dr. Klamar revealed normal results.  Id.  Dr. Klamar noted Plaintiff was independent in his activities of daily living, with slightly impaired speech and minimal difficulty with his memory.  Id.  The doctor assessed Plaintiff as having made a very good recovery, but recommended that he be evaluated by a neurologist for seizures (R. at 190-191).

On February 1, 2001, Plaintiff underwent an electroencephalogram (EEG) at the request of treating neurologist, Dr. Robert Todd (R. at 222).  The doctor opined Plaintiff's EEG was abnormal, with possible epileptiform waves. Id.  Dr. Todd recommended Plaintiff undergo another EEG after 24 hours of sleep deprivation.  Id.

---

[7]Tegretol, or generic Carbamazepine, is used alone or in combination with other drugs to treat certain types of epileptic seizures.  Common side effects include drowsiness and dizziness.  Less common, but more serious, side effects include headache, confusion, headaches, and vomiting. See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682237.html

Dr. Todd gave Plaintiff a thorough physical examination on February 5, 2001 (R. at 217-221).  Plaintiff's physical, motor, sensory, and neurological examinations were unremarkable (R. at 219-220).  Dr. Todd increased Plaintiff's dosage of Tegretol, and recommended Plaintiff not drive a motor vehicle for one year (R. at 220).  While the doctor concurred with Plaintiff's wish to return to work, he recommended Plaintiff find something that did not require him to work with heavy machinery.  Id.

Plaintiff underwent a second EEG at the request of Dr. Todd on March 1, 2001 (R. at 214).  Dr. Todd's impression was that the EEG was abnormal with epileptiform activity.  Id.

Plaintiff was examined by his primary treating physician, Dr. Karl Hafner, on March 29, 2001 (R. at 227).  Plaintiff denied any problems or health concerns.  Id.  The doctor noted he was alert, oriented, and interacted well.  Id.  Plaintiff told Dr. Hafner he was living independently and "working out," and that he was scheduled to return to work as a janitor at Carrier Corporation.  Id.

Plaintiff followed up with Dr. Hafner on April 6, 2001 (R. at 226).  After an unremarkable physical examination, the doctor noted Plaintiff was "doing well," and was taking a physical education class at a community college.  Id.

On May 25, 2001, Plaintiff was discharged from his speech and language therapy program (R. at 188-189).  His therapist opined he had made "excellent progress" over the course of treatment, and that Plaintiff had

maximized his skills.  Id.  She noted he continued to have difficulty with comprehension of complex information (R. at 188).

Plaintiff followed up with Dr. Todd on June 13, 2001 (R. at 214). The doctor noted Plaintiff was doing well on the increased dosage of Tegretol and reported no side effects.  Id.  Plaintiff's physical examination was unremarkable.  Id.  Dr. Todd requested Plaintiff return to see him in one year. Id.

On June 21, 2001, Plaintiff asked his primary care provider, Dr. Michael Alcasid, to clear him to play flag football (R. at 243).  Because Dr. Alcasid had no information about Plaintiff's sports limitations, he referred Plaintiff to Dr. Rodziewicz or Dr. Klamar.  Id.

Plaintiff was treated by Dr. Alcasid again on September 10, 2001, when he injured his right knee playing flag football (R. at 239-240).  Upon examination, Plaintiff's right knee was tender to palpation, but not visibly swollen (R. at 240).  The remainder of his physical examination was unremarkable and Plaintiff reported no other problems (R. at 239-240).  Dr. Alcasid referred Plaintiff to an orthopedic specialist (R. at 240).

On June 25, 2002, Plaintiff was treated by Dr. Hafner (R. at 225). Plaintiff reported that he could not continue with classes at a community college because he "had too many problems remembering things."  Id.  The doctor noted Plaintiff was confused about common knowledge questions such as the name of the President of the United States, and the day of the week. Id.  Dr. Hafner assessed Plaintiff as having an old head trauma with memory

deficits and chronic headaches.  Id.  The doctor opined Plaintiff was

"definitely, at this point, disabled," and did not foresee Plaintiff returning to

work in the near future.  Id.

Plaintiff was treated by Dr. Alcasid on July 11, 2002 (R. at 232).  He

complained of frequent headaches, anger, frustration, depression, and

difficulty breathing.  Id.  Plaintiff reported he took his anti-seizure medication

regularly and had not had any recent seizures.  Id.  He denied chest pain,

shortness of breath, or palpitations.  Id.  Plaintiff denied any other health

concerns.  Id.  His physical examination was unremarkable. Id.  Dr. Alcasid

recommended Plaintiff see a mental health professional, as well as follow up

with a neurologist.  Id.  The doctor prescribed Zoloft[8], an anti-depressant that

was compatible with Tegretol, Plaintiff's anti-seizure medication.  Id.

On July 15, 2002, Plaintiff was examined by State agency

psychologist, Kristen Barry, Ph.D. (R. at 246-250).  Dr. Barry noted Plaintiff

drove himself to the appointment, a distance that required 40 minutes driving

time (R. at 246).  Plaintiff complained of being disabled by a traumatic brain

injury that resulted in angry outbursts, frustration, and memory problems (R.

at 247).  The doctor observed Plaintiff exhibited good hygiene and was

appropriately dressed (R. at 248).  His speech was fluent and clear, with

adequate expression.  Id.  Dr. Barry noted Plaintiff's thought processes were

coherent and goal directed, with no evidence of hallucinations, delusions, or

---

[8] Zoloft, or generic Sertraline, is used to treat depression, obsessive-compulsive disorder, panic attacks, posttraumatic stress disorder, and social anxiety disorder.  Common side effects include nausea, vomiting, diarrhea, drowsiness, excessive tiredness, and headache.  See http://www.nlm.nih.gov/medlineplus/druginfo/meds/2697048.html

paranoia.  Id.  The doctor recorded Plaintiff was irritable, and appeared to be
easily frustrated.  Id.  She noted Plaintiff's attention and concentration
appeared grossly intact, but his recent and remote memory skills appeared to
be impaired.  Id.  Dr. Barry estimated Plaintiff's intellectual functioning to be in
the "average to low average" range, with fair judgment and insight (R. at 248-
249.  She assessed Plaintiff as able to follow and understand simple
directions and instructions, although she noted he appeared to have difficulty
handling stressors (R. at 249).  Dr. Barry recommended Plaintiff continue with
counseling and medical treatment.  Id.  She also noted Plaintiff "may need
some vocational rehabilitation down the road" (R. at 250).

          Plaintiff underwent a neurologic examination by State agency
physician, Dr. Berton Shayevitz, on July 16, 2002 (R. at 251-254).  He told the
doctor he had been driven to the appointment by a friend, but was able to
drive short distances independently (R. at 252).  Plaintiff complained of
painful headaches that occurred an average of six times each day (R. at 251).
He told the doctor he took Motrin, Tylenol, or Aleve to relieve his symptoms.
Id.  He reported his only prescription medication was Tegretol.  Id.  Plaintiff
told Dr. Shayevitz he had used marijuana about three weeks earlier (R. at
252).  The physical examination of Plaintiff performed by Dr. Shayevitz
revealed normal results (R. at 252-254).  Dr. Shayevitz opined Plaintiff was
not physically limited, other than a somewhat restricted lateral visual field (R.
at 254).  However, the doctor thought Plaintiff had significant cognitive

limitations with memory, and possibly judgment.  Id.  Dr. Shayevitz also

opined Plaintiff's headaches would moderately limit his ability to function.  Id.

On July 24, 2002, a State agency disability analyst completed a

Physical Residual Functional Capacity Assessment of Plaintiff (R. at 271-

277).  Based on the information contained in Plaintiff's medical record, the

analyst assessed Plaintiff as capable of meeting the demands of light work[9]

(R. at 272).  The analyst noted that Plaintiff's allegations with regard to his

symptoms were partially credible, but it was unlikely he experienced the

symptoms he claimed to the degree alleged (R. at 276).

A State agency consulting physician, Dr. Zenaida Mata, completed

a Psychiatric Review Technique form assessing Plaintiff's mental functioning

on July 29, 2002 (R. at 281-292).  Dr. Mata opined Plaintiff had an anxiety-

related disorder that produced a mild restriction in Plaintiff's activities of daily

living, a mild degree of difficulty in Plaintiff's ability to maintain social

functioning, and a moderate degree of difficulty for Plaintiff to maintain

concentration, persistence, or pace (R. at 281, 291).  Dr. Mata also completed

a Mental Residual Functional Capacity Assessment of Plaintiff on July 29,

2002 (R. at 278-280).  She assessed Plaintiff as being moderately limited in

his abilities to understand and remember detailed instructions, to carry out

detailed instructions, and to maintain attention and concentration for extended

periods of time (R. at 278).  Relying on the examination completed by Dr.

---

[9] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  See 20 C.F.R. § 404.1567.

Barry on July 15, 2002, Dr. Mata opined that while Plaintiff may have some difficulty handling stressors in the workplace, he nevertheless retained the ability to perform a job with simple tasks (R. at 279-280).

On November 5, 2002, Plaintiff was admitted to the Inpatient Treatment Unit at Oswego Hospital Behavioral Services Division with acute suicidal ideation (R. at 305-308).  Prior to his hospitalization, he had missed appointments with his psychiatrist, discontinued his regular prescription medications, and started using street drugs including crack cocaine, LSD, and OxyContin[10] (R. at 305).  Plaintiff reported symptoms of depression, insomnia, confusion and memory difficulties, and agitation.  Id.  He told the admitting physician, Dr. Vilas Patil, that he did not have a place to live and supported himself with Social Services (R. at 306).  During his hospitalization, Plaintiff was treated with prescription drugs including Tegretol, Seroquel[11], Klonopin[12], and Zoloft (R. at 303).  Plaintiff was discharged from inpatient treatment on 11/21/2002 (R. at 301-304).  At the time of his release, Dr. Patil reported Plaintiff was pleasant and cooperative (R. at 303).  Plaintiff denied feelings of depression or suicidal ideation.  Id.  He was alert and oriented, denied hallucinations, and showed no signs of delusions or paranoia.  Id.  Dr. Patil recommended a treatment plan for Plaintiff that included rehabilitation on an

---

[10] OxyContin, or generic Hydrocodone and Oxycodone, is an opiate drug used to treat extreme pain.  See http://www.nlm.nih.gov/medlineplus/ency/article/007285.html

[11] Seroquel, or generic Quetiapine is used to treat the symptoms of schizophrenia.  It is also used to treat episodes of mania or depression in patients with bipolar disorder.  Common side effects include drowsiness, dizziness, pain, weakness, and headache.  Less common, but more serious, side effects include fainting and seizures.  See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698019.html

[12] Klonopin, or generic Clonazepam, is used to treat seizures and anxiety.  Common side effects include drowsiness, dizziness, tiredness, and weakness.  See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html

inpatient or outpatient basis, treatment with prescription medications, and follow-up with Dr. Patil (R. at 303-304).

On November 26, 2002, Dr. Patil provided Plaintiff with a letter, presumably at Plaintiff's request, in which he stated that it was his medical opinion that Plaintiff had been "totally disabled for the past few years. Further, you should expect your condition to continue resulting in your being unable to work, participate in work readiness activities, or even effectively act or advocate for your best interests, into the foreseeable future" (R. at 293). Dr. Patil further stated "This determination should facilitate your eligibility for Social Security eliminate department of Social Services expectations for a programmed approach to rehabilitation [sic]." Id.  The doctor advised Plaintiff to work with an adult protective case worker for assistance with issues in daily life, to continue taking prescribed medications, and to keep scheduled psychiatric appointments.  Id.

Plaintiff was re-admitted to Oswego Hospital On December 16, 2002, when he reported having suicidal ideations again (R. at 294-297).  He told the admitting psychiatrist, Dr. Patil, that "he got together with his brother, got involved in drinking, using some marijuana.  Later he was told by the landlord that he cannot stay there and that led to his starting to have suicidal ideations.  Thus he came here [to Oswego Hospital]" (R. at 294).  While in the hospital, Plaintiff was continued on his regular medications including Tegretol, Klonopin, Seroquel, and Zoloft (R. at 296).  The doctor reported that during the four days Plaintiff was hospitalized, his sleep, appetite, and interactions

improved.  Id.  Dr. Patil also noted that "throughout the course of this hospitalization, he did not really demonstrate any behaviors that would be indicative of his being dangerous to himself or others."  Id.  Plaintiff was discharged from the hospital on December 20, 2002 (R. at 296-297).

Plaintiff followed up with Dr. Patil on January 3, 2003 (R. at 318). He reported he had been eating and sleeping well, and was maintaining good physical health.  Id.  Plaintiff told the doctor he had no seizures, and that his mood was stable.  Id.  Dr. Patil observed Plaintiff was pleasant, cheerful, and cooperative.  Id.  He denied current feelings of depression, suicidal ideations, hallucinations, or delusions.  Id.  The doctor did note Plaintiff had cognitive deficits consistent with a left frontal lobectomy.  Id.  The doctor recommended Plaintiff continue taking his prescription medications on a regular basis, and return for another appointment in one month.  Id.

On February 6, 2003, Plaintiff was treated again by Dr. Patil (R. at 316).  Plaintiff told the doctor he was doing very well, and had not used drugs or alcohol.  Id.  He was sleeping well and had a good appetite.  Id.  Upon mental status examination, Dr. Patil observed that Plaintiff was pleasant, cheerful, and cooperative.  Id.  Plaintiff denied current feelings of depression, suicidal ideations, delusions, or hallucinations.  Id.  In his notes from the examination, Dr. Patil recorded "there was no evidence of cognitive deficits." Id.  The doctor requested Plaintiff return for another appointment in one month.  Id.

Plaintiff followed up with Dr. Patil on March 5, 2003 (R. at 315). Again, Plaintiff reported he was eating and sleeping well, maintaining good physical health, and avoiding drugs and alcohol.  Id.  Dr. Patil noted Plaintiff was pleasant and cooperative.  Id.  Plaintiff denied current feelings of depression, suicidal ideations, delusions, or hallucinations.  Id.  At this visit, Dr. Patil recorded Plaintiff's "cognition was consistent with his brain injury as described in my previous notes."  Id.  Plaintiff was to return for another appointment in one month.  Id.

Plaintiff was treated by Dr. Patil on April 2, 2003 (R. at 314).  Again, Plaintiff reported he was doing well and avoiding drugs and alcohol.  Id.  The doctor observed Plaintiff was pleasant, cheerful, and cooperative.  Id.  Plaintiff denied current feelings of depression, suicidal ideations, delusions, or hallucinations.  Id.  Dr. Patil requested Plaintiff return for another appointment in one month.  Id.

On April 30, 2003, Plaintiff followed up with Dr. Patil (R. at 313). Plaintiff reported he had had a stressful month because he broke up with his current girlfriend and resumed a relationship with a former girlfriend.  Id. However, Plaintiff told the doctor he had been eating and sleeping well, and had not had a problem with temper control.  Id.  Upon mental status examination, Dr. Patil observed that Plaintiff was pleasant and cooperative. Id.  Plaintiff denied current feelings of depression, suicidal ideations, delusions, or hallucinations.  Id.  The doctor recommended Plaintiff continue

with his current medications and return for another appointment in one month.
Id.

Dr. Patil completed a Medical Assessment of Ability to Do Work-
Related Activities (Mental) for Plaintiff on June 11, 2003 (R. at 310-311).
Within the realm of Making Occupational Adjustments, the doctor assessed
Plaintiff's ability to "Follow work rules" as "fair," but he rated Plaintiff as "poor"
in his abilities to "Relate to co-workers," "Use judgment," "Interact with
supervisors," "Function independently," and "Maintain attention/concentration"
(R. at 310).  Dr. Patil assessed Plaintiff as having no useful ability to "Deal
with [the] public" or "Deal with work stress."  Id.  In the realm of Making
Performance Adjustments, Dr. Patil assessed Plaintiff as having no ability to
"Understand, remember, and carry out complex job instructions," a poor
ability  to "Understand, remember, and carry out detailed, but not complex,
job instructions," and a fair ability to "Understand, remember, and carry out
simple job instructions" (R. at 311).  With respect to Making Personal/Social
Adjustments, the doctor assessed Plaintiff as having a fair ability to "Maintain
personal appearance," a poor ability to "Demonstrate reliability," and no useful
ability to "Behave in an emotionally stable manner," or to "Relate predictably
in social situations."  Id.  This is the last medical entry in Plaintiff's record.

The ALJ assessed Plaintiff capable of a wide range of light
unskilled work based on the totality of evidence presented by his treating
physicians, consulting physicians, test results, and the opinions of a State
agency examining physician, a State agency examining psychologist, a State

agency non-examining disability analyst, and a State agency non-examining psychiatrist.

There is no question from Plaintiff's medical record that he suffered a life-threatening traumatic brain injury in April 2000 (R. at 172-179).  He underwent three surgeries and extensive rehabilitation in the months following his accident (R. at 169-170, 194-195, 196-198, 201-203, 204-206, 207-209, 210-213).  When Plaintiff was evaluated by a State agency psychologist and a State agency physician in August 2000, approximately four months after his accident, testing revealed his intellectual capacity was in the mild range of mental retardation, and that he had limitations in cognition, memory and judgment (R. at 138-146, 256-259).  Further, State agency physician Dr. Shayevitz agreed with the physical limitations proposed by Plaintiff's treating physicians, including avoiding strenuous and/or dangerous activities, working around dangerous machinery, and activities that would require overhead lifting (R. at 256-259).

From August 2000, until he was released to return to work on March 29, 2001, Plaintiff made progress with his rehabilitation (R. at 147-148, 149-157, 158-163, 165, 167-168, 192-193, 215, 217-221, 222, 244-245). Even though Plaintiff was hospitalized briefly for seizures on November 25-26, 2000, he told his treating physician that he had discontinued taking his anti-seizure medication, Tegretol (R. at 167-168).  Electroencephalogram testing showed Plaintiff had abnormal epileptiform discharges, but an

increased dosage of Tegretol effectively eliminated further documented seizure activity (R. at 214, 215, 217-221, 222, 227, 232).

Plaintiff returned to full time employment in the housekeeping department of Carrier Corporation on May 7, 2001, and remained employed until November 19, 2001 (R. at 99).  Within the time frame from his release to return to full time employment on March 29, 2001, until June 2002, Plaintiff's medical record reflects that he experienced relatively few medical problems of a serious, or potentially disabling, nature (R. at 187, 188-189, 214, 226, 227, 239-240, 243).  As an example, on June 13, 2001, Dr. Todd reported to Dr. Klamar that he had followed up with Plaintiff after he increased his dosage of Tegretol, and that Plaintiff had had no additional episodes of seizures, and experienced no side effects, from the increased dosage (R. at 214).  Plaintiff told Dr. Todd that "he is working in maintenance right now, but soon hopes to be back on his old machine, which he was very comfortable at."  Id.  One week later, on June 21, 2001, Plaintiff requested clearance from Dr. Alcasid to play flag football (R. at 243).  Plaintiff reported to Dr. Alcasid an increase in headaches coupled with the flu-like symptoms of nausea, vomiting and diarrhea on August 31, 2001 (R. at 241).  However, on September 12, 2001, Plaintiff was seen by Dr. Alcasid for a knee injury incurred when he was playing football three days earlier (R. at 239-240).

Plaintiff was treated by Dr. Alcasid on five occasions for various acute conditions including sinusitis, and bronchitis between November 30, 2001, and April 5, 2002 (R. at 234, 235, 236, 237, 238).  He did not report an

increase in headaches, depression, or seizures at any of these visits.  Id.

However, on July 11, 2002, Plaintiff reported to Dr. Alcasid that he had

frequent headaches he believed to be caused tension, anger outbursts, and

depression, and he was referred for an appointment with a psychiatrist in

August 2002 (R. at 232-233).  Dr. Alcasid also prescribed Zoloft, and anti-

depressant that was compatible with Tegretol (R. at 232).  Plaintiff failed to

follow up with Dr. Alcasid as requested, and was a "no show" for his

scheduled August 8, 2002 appointment.  Id.

While Plaintiff did attend his appointments with State Agency

examiners, Doctors Barry and Shayevitz, it does not appear he was treated

by a psychiatrist until his admission to Oswego Hospital on November 5, 2002

(R. at 305-308).

Records of treatment during Plaintiff's hospitalization from

November 5, 2002, until November 21, 2002, consist of Dr. Patil's intake

record and his discharge record (R. at 301-304, 305-308).  At the time of

intake, Plaintiff claimed confusion, depression and suicidal ideation, and

reported he was using street drugs including crack cocaine, LSD, and

OxyContin (R. at 305).  He also disclosed he had discontinued his

prescription medications including Zyprexa[13], Zoloft, and Tegretol.  Id.  During

his hospitalization, Plaintiff was restarted on his regular medications and his

condition improved (R. at 303).  When Plaintiff was discharged from Oswego

---

[13] Zyprexa, generic name Olanzapine is used to treat the symptoms of schizophrenia. It is also
used to treat bipolar disorder.  Common side effects include drowsiness, dizziness, unusual
behavior, depression, and difficulty falling or staying asleep.  Less common, but more serious,
side effects include seizures and changes in vision.  See
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601213.html

Hospital, Dr. Patil reported he was "pleasant and cooperative," with a "neutral mood and appropriate affect." Id. Plaintiff was alert and oriented and denied current depression or suicidal ideation. Id. Dr. Patil noted that "it does take him a long time to process things. His short term memory is somewhat poor. He tends to have impulsivity. He tends to perseverate[14]." Id.

Plaintiff was re-admitted to Oswego Hospital on December 16, 2002, for depression and suicidal ideation (R. at 298-300). He described the precipitating factors to this hospitalization as "his mother living in Florida," "feeling lonely," "drinking, using some marijuana, and being told by his brother's landlord that "he cannot stay there" (R. at 298). While in the hospital, Plaintiff was continued on his regular medications including Tegretol, Klonopin, Seroquel, and Zoloft (R. at 296). Dr. Patil opined that while Plaintiff was in the hospital, he did not demonstrate any behaviors that would suggest he was a danger to himself or others. Id. At the time of Plaintiff's discharge from the hospital, the doctor noted he was "alert and oriented," "pleasant and cooperative…with [a] neutral mood," and "denied current feelings of depression, denied current suicidal ideations." Id.

In regular monthly appointments with Plaintiff between January 3, 2003, and April 30, 2003, Dr. Patil reported Plaintiff was sleeping well, maintaining good appetite and physical health, and preserving a stable mood (R. at 313, 314, 315, 316, 318). The doctor described Plaintiff as pleasant and cooperative, and noted he denied current feelings of depression, suicidal

---

[14] Perseverate is a continuation of something (as repetition of a word) usually to an exceptional degree or beyond a desired point. http://www.merriam-webster.com/dictionary/

ideations, delusions, or hallucinations.  Id.  While Plaintiff described some stress in his life from changing relationships with girlfriends, Dr. Patil noted Plaintiff "handled the situation well," and "has not had problems with temper control" (R. at 316, 313).

Plaintiff asserts the ALJ erred by not giving controlling weight to Dr. Patil's opinion, as expressed in a letter written to Plaintiff on November 26, 2002, that "As your treating psychiatrist, it is my medical opinion that you have been totally disabled for the past few years.  Further, you should expect your condition to continue, resulting in your being unable to work, participate in work readiness activities, or even effectively act or advocate for your best interests into the foreseeable future" (R. at 293).  See Plaintiff's Brief, pp. 6-7. Dr. Patil prepared this letter shortly after treating Plaintiff during a 16-day hospitalization (R. at 293, 294-297).  The record is silent on whether the doctor requested and reviewed information from Plaintiff's other treating sources, or relied solely on information reported by Plaintiff, when formulating his opinion.  Further, the record is clear that Plaintiff did successfully participate in work readiness activities during his rehabilitation, and engaged in substantial gainful activity for more than six months during the prior year (R. at 59, 60, 188-189, 217-221, 226, 227).

Moreover, the issue of "disability" under the Act is not a medical issue to be decided by a treating source, but an administrative finding reserved to the Commissioner.  See 20 C.F.R. 404.1527(e); SSR 96-5p.

Treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance.  Id.

Plaintiff further claims the ALJ erred by failing to give controlling weight to Dr. Patil's opinions as expressed in a Medical Source Statement of Ability to Do Work-Related Activities (Mental) prepared on June 11, 2003 (R. at 310-311).  See Plaintiff's Brief, pp. 4-9.  Plaintiff asserts Dr. Patil's treating source opinions expressed in this Medical Source Statement are consistent with statements and opinions denoted by Plaintiff's other treating sources, as well as with the opinions of State agency examiners Doctors Barry and Shayevitz.  Id.  As discussed in the medical evidence, Dr. Patil assessed Plaintiff having a poor ability, or no useful ability, to make appropriate occupational adjustments in the workplace, and only a fair ability to follow work rules (R. at 310).  He suggested Plaintiff could understand, remember, and carry out simple job instructions, and noted Plaintiff had "adequate memory functioning, but considerable impairment in establishing goal directed behavior which is appropriate.  Also, when stressed, insight and judgment is diminished…" (R. at 311).  Further, Dr. Patil opined that while Plaintiff had a fair ability to maintain his personal appearance, he had no useful ability to behave in an emotionally appropriate manner or to relate predictably in social situations.  Id.

Dr. Patil's own treatment notes are inconsistent with some of the opinions he expressed in his Medical Source Statement (R. at 310-311, 313, 314, 315, 316, 318).  When Plaintiff took his medication as prescribed, Dr.

Patil's notes show that Plaintiff regularly attended his medical appointments, was cheerful and cooperative, and denied depression or suicidal ideations (R. at 313, 314, 315, 316, 318).  Plaintiff was able to cope with stress in his interpersonal relationships, and engage in goal-directed behavior.  Id.  He was not irritable or impulsive.  Id.  Further, Dr. Patil opined in his Medical Source Statement that Plaintiff had a satisfactory ability to follow work rules, understand, remember, and carry out simple job instructions, and maintain personal appearance (R. at 310-311).

Plaintiff claims in his brief that Dr. Patil's opinions are consistent with the medical findings of Plaintiff's treating physicians, Doctors Todd, Klamar, and Hafner, and with State agency physicians, Doctors Barry and Shayevitz.  See Plaintiff's Brief, pp. 5-12.  However, the record reflects Dr. Klamar last examined Plaintiff on August 31, 2000, a little more than four months after his accident, and well before Plaintiff was able to engage in work readiness (R. at 192-193).  Dr. Todd diagnosed Plaintiff with an abnormal electroencephalogram marked by epileptiform activity, but opined an increased dosage of Tegretol taken regularly would control seizure activity (R. at 220, 222).  Dr. Todd approved of Plaintiff's return to work, as long as Plaintiff did not work around machinery (R. at 220).  Dr. Hafner, who also approved Plaintiff's return to work in March 2001, examined Plaintiff again in June 2002, when he reported memory deficits, chronic headaches, and depression (R. at 225).  The doctor planned to discuss with Plaintiff's neurologist whether or not changing his anti-seizure medication, and

prescribing an anti-depressant, would improve his condition.  Id.  While Dr. Hafner opined, "Definitely, at this point, he is disabled.  I do not foresee him going back to work in the near future…," he followed with, "I think the other issues [anti-seizure medication and anti-depressant] need to be more significantly addressed before we can say this is a permanent chronic condition."  Id.  No follow up notes from Dr. Hafner appear in Plaintiff's record.

Plaintiff further asserts the opinions expressed in Dr. Patil's Medical Source Statement are consistent with the information provided by State agency examiners Doctors Barry and Shayevitz (R. at 246-250, 251-254). See also Plaintiff's Brief, pp. 7-9, 12.  Dr. Shayevitz opined that other than a restricted visual field laterally, Plaintiff was not physically limited (R. at 254). While the doctor observed Plaintiff may have significant cognitive limitations, he suggested in his Medical Source Statement that Plaintiff's mental status would best be evaluated by Dr. Barry.  Id.  Dr. Barry noted that Plaintiff's complaints of depression, anxiety, and cognitive disorder were consistent with the examination results (R. at 249).  However, Dr. Barry also opined that Plaintiff, at the time of the examination, was able to follow and understand simple directions and instructions, and appeared to be a fairly intelligent individual.  Id.  This opinion does not support Plaintiff's contention that Dr. Barry's assessment is consistent with the assessment of Dr. Patil that Plaintiff would be unable to meet the demands of substantial gainful activity; rather, it is consistent with Dr. Patil's assessment that Plaintiff could follow work rules

and was able to understand, remember, and carry out simple job instructions (R. at 310-311).

Plaintiff complains that the ALJ, in making her determination that Plaintiff was able to perform a significant range of simple light work, relied only on the opinion of a non-examining State disability analyst, and therefore, set her own lay opinion against the medical evidence submitted by treating and examining physicians.  See Plaintiff's Brief, p. 13.  From the ALJ's decision, it is clear this is not the case (R. at 17-20).  The ALJ examined Plaintiff's medical evidence from his hospitalizations, outpatient tests, and doctors' appointments.  Id.  As an example, the ALJ noted Plaintiff suffered a generalized major motor seizure in November 2000 (R. at 17).  She discussed his February 2001 abnormal electroencephalogram with epileptiform activity, and that he had been treated with the prescription drug, Tegretol.  Id.  The ALJ pointed out that at the time of Plaintiff's neurological examination on July 16, 2002, Plaintiff had been seizure-free for a number of months (R. at 17, 251).  The Court also notes Plaintiff reported to Dr. Patil that he was seizure-free on January 3, 2003 (R. at 318).

As a second example, the ALJ discussed the opinions of Doctors Barry and Shayevitz, whose examination notes and Medical Source Statements were consistent with the record as a whole (R. at 20).  The ALJ considered the opinions and assessments of these State agency medical examiners as required in 20 C.F.R. § 404.1527(f) and SSR 96-6p, and gave

these opinions and assessments considerable weight as they were consistent with the medical evidence of record (R. at 20).

The ALJ did not base her assessment of Plaintiff's residual functional capacity only on her lay opinion, and that of a non-examining State agency consultant, while ignoring overwhelming evidence that Plaintiff is under a disability, as Plaintiff claims. See Plaintiff's Brief, pp. 2-15. The ALJ's assessment was supported by the detailed reports from Plaintiff's treating physicians, physical and mental examinations of Plaintiff by a State agency examining physician and a State agency examining psychologist, and by reviews of Plaintiff's medical records by a non-examining State agency consultants (R. at 214, 215, 217-221, 222, 225, 227,246-250, 251-254, 271-277, 278-280, 281-292, 298-300, 301-304, 310-311, 313-318). It is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability. See 20 C.F.R. §§ 404.1512(b)(6), 404.1513(c), 404.1527(f)(2), 416.912(b)(6), 416.913(c), and 416.927(f)(2); see also Leach ex. Rel. Murray v. Barnhart, No. 02 Civ. 3561, 2004 WL 99935, at 9 (S.D.N.Y. Jan. 22, 2004) ("State agency physicians are qualified as experts in the evaluation of medical issues in disability claims. As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole.") Such reliance is particularly appropriate where, as here, the opinions of the State agency physician and non-examining State agency consultant are supported by the

weight of the evidence, including the medical findings of Plaintiff's examining and treating physicians.

Based on the foregoing, the Court finds the ALJ did not ignore the medical findings and opinions of Plaintiff treating physicians, Doctors Patil, Todd, Klamar, and Hafner, and the medical findings and opinions of State agency examiners, Doctors Barry and Shayevitz, but did properly reject conclusory statements, such as "It has been my medical opinion that you have been totally disabled for the past few years," and "Definitely, at this point he is disabled" (R. at 225, 293). The ALJ also properly rejected the restrictive assessment of Plaintiff's mental residual functional capacity completed by Dr. Patil, as this assessment was not supported by his own records (R. at 293, 294-297, 298-300, 301-304, 305-308, 310-311, 313, 314, 315, 316, 318). It is the sole responsibility of the ALJ to weigh all medical evidence and resolve any material conflicts in the record. See Richardson v. Perales, 402 U.S. 389, 399, 91 S. Ct. 1420, 1426, 28 L. Ed. 2d 842 (1971). Under the circumstances presented in this case, it cannot be said that the ALJ disregarded the medical evidence from Plaintiff's treating physicians and State agency examiners and instead substituted her lay opinion for competent medical evidence. Rather, the Court finds that the ALJ carefully reviewed and acknowledged the medical evidence and opinions of Doctors Patil, Todd, Klamar, Barry, and Shayevitz, and rejected those opinions deemed to be conclusory or inconsistent with the medical evidence these doctors provided in Plaintiff's record.

**Challenge 3: The ALJ Failed to Properly Consider Plaintiff's Pain and Subjective Symptom Testimony and Did Not Provide Sufficiently Specific Reasons for Her Findings**

13.      Plaintiff's third allegation is that the ALJ failed to properly consider Plaintiff's pain and subjective symptom testimony in determining Plaintiff was not disabled under the Act.  See Plaintiff's Brief, pp. 14-17.  As an example, Plaintiff claimed he had side effects from his medications that included frequent bouts of sleepiness (R. at 346).  He told the ALJ he had headaches that were relieved by taking the drug Seroquel and falling asleep (R. at 348).  He also noted during his hearing that he cannot lift or push anything from chest-level over his head (R. at 347).  Further, Plaintiff challenges the ALJ's decision on the basis that she failed to cite sufficiently specific reasons to make clear to Plaintiff and subsequent reviewers the weight she gave to Plaintiff's statements, as well as the reasons for assigning the weight. See Plaintiff's Brief, pp. 15-16.  The Court agrees with Plaintiff; the ALJ's decision is deficient because an adequate analysis of Plaintiff's credibility was not completed (R. at 19).

In her decision, the ALJ noted "The claimant has alleged limitations due to having part of his brain removed, short term memory loss, personality 'loss,' grand mal seizures, easy frustration, and headaches" (R. at 19).  The ALJ did not include with Plaintiff's limitations his claim of being unable to lift or push items from chest-level to above his head, or his claim of side effects from his medications (R. at 346, 348).  The ALJ stated in her decision that "While the degree of limitation is not as great as the claimant alleges, the

claimant, for the most past, suffers from most of these symptoms, secondary to the residual effects of the brain injury he suffered.  Accordingly, his allegations of impairment, but not necessarily to the degree of the limitation, are generally credible, in light of the injury he suffered."  Id.

Courts in the Second Circuit have determined pain is an important element in DIB and SSI claims, and pain evidence must be thoroughly considered.  See Ber v. Celebrezze, 333 F.2d 923 (2d Cir. 1994).  Further, if an ALJ rejects a claimant's testimony of pain and limitations, he or she must be explicit in the reasons for rejecting the testimony.  See Brandon v. Bowen, 666 F. Supp. 604, 609 (S.D.N.Y. 1997).  Moreover, the Commissioner's regulations give specific information about how the Social Security Administration treats a claimant's reports of pain and/or limitations caused by an impairment.  See 20 C.F.R. § 404.1529(c)(2).  The regulations state "We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled.  However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."  Id.  When a claimant's symptoms suggest a greater level of pain and/or limitation that can be shown by objective evidence alone, the Commissioner must consider other evidence when assessing a claimant's statements, including (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of

the claimant's pain and/or symptoms, (3) precipitating and aggravating

factors, (4) the type, dosage, effectiveness and side effects of any medication

the claimant currently takes, or has taken, to alleviate pain and other

symptoms, (5) treatment, other than medication, a claimant receives or has

received for relief of pain and other symptoms, (6) any measures the claimant

uses or has used to relieve pain or other symptoms (e.g. lying flat on your

back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.),

and (7) other factors concerning a claimant's functional limitations and

restrictions due to pain and other symptoms.  See 20 C.F.R. §

404.1529(3)(i)(ii)(iii)(iv)(v)(vi)(vii).

Once the ALJ has considered a claimant's medical evidence and

allegations of pain and/or limitations from his or her impairment(s), Social

Security Ruling SSR 96-7p requires that the ALJ "…consider the entire case

record and give specific reasons for the weight given to the individual's

statements.  The finding on the credibility of the individual's statements

cannot be based on an intangible or intuitive notion about an individual's

credibility.  The reasons for the credibility finding must be grounded in the

evidence and articulated in the determination or decision.  It is not sufficient to

make a conclusory statement that 'the individual's allegations have been

considered,' or that 'the allegations are (or are not) credible.'"  See  SSR 96-

7p.  In the instant case, the ALJ merely noted some of the symptoms and

limitations Plaintiff claimed, apparently dismissed others, and stated Plaintiff's

allegations of impairment were "generally credible," but not to the degree

alleged (R. at 19).  This leaves Plaintiff, and the Court, to guess at what medical and other evidence the ALJ found to be less than fully credible, and how she weighted the evidence that was presented in this case.

This case is remanded to the Commissioner so that the ALJ may further develop credibility findings in a manner consistent with the Regulations at 20 C.F.R. § 404.1529 and SSR 96-7p.

### Challenge 4: The ALJ Improperly Concluded Plaintiff Retained The Residual Functional Capacity to Work on a Regular and Continuous Basis

14.    Plaintiff's fourth challenge to the ALJ's decision is that she improperly concluded Plaintiff retained the residual functional capacity to work on a regular and continuous basis in spite of pain and limitations from his impairment and the side effects of his medications.  See Plaintiff's Brief, pp. 15-17.  Specifically, Plaintiff complains that all of his limitations, especially those resulting from the side effects of his medications, were not considered by the ALJ when she determined he retained the residual functional capacity to perform a wide range of simple light work.  See Plaintiff's Brief, pp. 16-17.

The Court declines to rule on this challenge at this time. Because of the deficient credibility analysis discussed above, it is not clear to the Court that the ALJ carefully considered and assigned a proper weight to all of the evidence in the case.  Further, the hypothetical given to the vocational expert who testified at Plaintiff's hearing may have been incomplete, given that Plaintiff testified to overhead lifting and/or pushing limitations, and side effects from his medications (R. at 346, 347, 348-349, 351-352, 353, 356-357).

Without a proper analysis of Plaintiff's pain and limitations that conforms to the guidelines set forth the in the Commissioner's regulations at 20 C.F.R. § 404.1529, and a credibility analysis that meets the requirements of SSR 96-7p, the Court cannot say that the ALJ's finding that Plaintiff could perform a substantial range of simple light work on a regular and continuous basis is based on the substantial evidence of the case.

## Conclusion

15.    After carefully examining the administrative record, the Court finds cause to remand this case to the Commissioner for further administrative proceedings consistent with this decision.  Accordingly:

IT HEREBY IS ORDERED, that Plaintiff's Motion for Judgment on the Pleadings is GRANTED in part and DENIED in part.


FURTHER, that Defendant's Motion for Judgment on the Pleadings is DENIED.


FURTHER, that this case is REMANDED to the Commissioner of Social Security for further proceedings consistent with this Decision and Order.


FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.

Victor E. Bianchini
United States Magistrate Judge

Dated: February 2, 2009
Syracuse, New York